*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

DEJUAN THOMPSON,

        Defendant-Appellant.

UNPUBLISHED
October 07, 2025
9:55 AM

No. 361842
Saginaw Circuit Court
LC No. 19-046551-FC

Before: K. F. KELLY, P.J., and MARIANI and ACKERMAN, JJ.

PER CURIAM.

Defendant appeals as of right his jury convictions of armed robbery, MCL 750.529, carrying a weapon with unlawful intent, MCL 750.226, and two counts of possessing a firearm during the commission of a felony (felony-firearm), MCL 750.227b(3).[1] The trial court sentenced him as a fourth-offense habitual offender, MCL 769.12, to concurrent terms of 20 to 30 years for armed robbery and 5 to 20 years for carrying a weapon with unlawful intent, to be served consecutively to concurrent two-year terms for the felony-firearm convictions.

On appeal, defendant raises three claims of error. He contends that (1) the delay between charging and trial violated his constitutional right to a speedy trial, (2) his postarrest statements should have been suppressed as involuntary, and (3) he is entitled to jail credit for time spent in custody before sentencing. We conclude that none of those arguments warrants relief. The delay in bringing defendant to trial was attributable largely to the COVID-19 pandemic and did not prejudice his defense. Although the trial court erred by admitting a portion of defendant's custodial statements obtained after coercive threats, that error was harmless beyond a reasonable doubt given defendant's earlier admissions and an unequivocal eyewitness identification. Finally, binding precedent forecloses his request for jail credit. We therefore affirm.

---

[1] The jury acquitted defendant of one count of being a felon in possession of a firearm, MCL 750.224f, and a corresponding felony-firearm count.

-1-

# I. BACKGROUND

This case arises from an armed robbery committed at a Saginaw residence on February 16, 2019. Three masked men entered the home after defendant's sister, Pamela Thompson, had twice visited the house earlier that day under the pretense of purchasing marijuana. During her second visit, Pamela remained on her phone until unlocking the back door to leave; at that moment, three armed men rushed inside. One allowed Pamela to exit, while the others demanded "money, guns, [and] weed" and held the home's residents at gunpoint as they searched the home.

One of the victims, LL, later identified defendant as the man who held a gun to her head. LL testified that she had seen and spoken with defendant on numerous prior occasions, including the day before the robbery, and knew him as Pamela's brother. She was "one hundred percent" certain in her identification based on his eyes, body structure, and voice.

Two days later, law enforcement officers attempted to stop defendant on an unrelated parole violation. When he failed to yield, the officers used a precision immobilization technique maneuver to end the pursuit. Defendant was arrested and, during a custodial interrogation, made inculpatory admissions regarding his role in the robbery.

Before trial, defendant moved to suppress his statements, asserting that they were made involuntarily because of intoxication, a head injury sustained during the arrest, and coercive threats made by law enforcement. After an evidentiary hearing, the trial court suppressed a portion of the interrogation but permitted the remainder to be admitted.

At trial, LL identified defendant as a perpetrator, additional witnesses testified, and the portion of defendant's interrogation deemed admissible was presented to the jury. Defendant was convicted and sentenced as described above. This appeal followed.

# II. DISCUSSION

## A. SPEEDY TRIAL

Defendant first contends that his constitutional right to a speedy trial was violated. "Whether a defendant was denied his constitutional right to a speedy trial is a mixed question of fact and constitutional law." *People v Smith*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 362114); slip op at 2. We review the trial court's findings of fact for clear error and review constitutional questions de novo. *Id*. Both the Michigan and United States Constitutions guarantee criminal defendants the right to a speedy trial. US Const, Am VI; Const 1963, art 1, § 20. The right is also guaranteed by statute and court rule. See MCL 768.1; MCR 6.004(A).

"The time for judging whether the right to a speedy trial has been violated runs from the date of the defendant's arrest." *People v Williams*, 475 Mich 245, 261; 716 NW2d 208 (2006). Because "a defendant's right to a speedy trial is not violated after a fixed number of days," a court determining whether a defendant has been denied a speedy trial must balance four factors: "(1) the length of delay, (2) the reason for delay, (3) the defendant's assertion of the right, and (4) the prejudice to the defendant." *Id*. at 261-262.

Applying these factors, we find no error in the trial court's denial of defendant's speedy-trial claim. Turning first to the length of delay, the relevant period commences at "either a formal indictment or information or else the actual restraints imposed by arrest and holding to answer a criminal charge," whichever occurs first. *United States v Marion*, 404 US 307, 320, 325; 92 S Ct 455; 30 L Ed 2d 468 (1971). "Following a delay of eighteen months or more, prejudice is presumed, and the burden shifts to the prosecution to show that there was no injury." *Williams*, 475 Mich at 262. "A presumptively prejudicial delay triggers an inquiry into the other factors to be considered in the balancing of the competing interests to determine whether a defendant has been deprived of the right to a speedy trial." *Id*. (cleaned up). Here, although defendant was arrested on February 18, 2019, it was for an unrelated parole violation. The felony complaint in this case was not issued—and the accompanying warrant not authorized—until June 18, 2019. Defendant's speedy-trial right therefore attached on that date. His trial did not begin until November 15, 2021, resulting in a 27-month delay. On its face, this factor weighs in defendant's favor, but the presumption of prejudice is rebutted after considering the remaining factors.

The second *Williams* factor—the reason for the delay—provides an excusable narrative. Delays attributable to defense requests are charged to the defendant. *Vermont v Brillon*, 556 US 81, 90-91; 129 S Ct 1283; 173 L Ed 2d 231 (2009). Unexplained or inexcusable delays caused by the court are attributed to the prosecution. *Smith*, ___ Mich App at ___; slip op at 3. "Although delays and docket congestion inherent in the court system are technically attributable to the prosecution, they are given a neutral tint and are assigned only minimal weight in determining whether a defendant was denied a speedy trial." *Id*. (cleaned up). By contrast, "delays caused by the COVID-19 pandemic are not attributable to the prosecution for purposes of a speedy-trial claim." *Id*. at ___; slip op at 5.

Here, defendant's trial was initially scheduled for January 7, 2020, and later adjourned to March 24, 2020. Before that date, the Governor declared a state of emergency in response to the onset of the COVID-19 pandemic, and the Michigan Supreme Court issued Administrative Order No. 2020-1, effective March 15, 2020, which "adopted emergency procedures in the state's court facilities." *Smith*, ___ Mich App at ___; slip op at 4. Effective March 18, 2020, the Supreme Court issued another order limiting courtroom access to no more than 10 persons. *Id*.; see also Administrative Order No. 2020-2, 505 Mich cii. Consistent with those directives, defendant's trial was repeatedly adjourned until September 7, 2021, when a final pretrial was held and a November trial date was scheduled. Defendant asserts that some adjournments were inadequately explained, but the register of actions reflects that the postponements were largely at the behest of the trial court due to pandemic restrictions. The remainder of the adjournments have not been shown to be unexplained or inexcusable such that they should be meaningfully attributed to the prosecution.

The third factor, defendant's assertion of his right, weighs in his favor. He timely filed a motion to dismiss on speedy-trial grounds.

The fourth factor—prejudice—is more telling. Because the 27-month delay is presumptively prejudicial, "the burden shifts to the prosecution to show that there was no injury." *Williams*, 475 Mich at 262. "There are two types of prejudice which a defendant may experience, that is, prejudice to his person and prejudice to his defense." *Smith*, ___ Mich App at ___; slip op at 6 (citation omitted). "[I]n considering prejudice, a reviewing court should look for examples

-3-

about how the delay between arrest and trial harmed the defendant's ability to defend against the charges." *Id*. at ___; slip op at 6.

The record shows that defendant suffered no such prejudice. To start, there is no identifiable prejudice to his defense arising from the delay. See *id*. at ___; slip op at 5 ("Most important to our review . . . is that the delay did not create any identifiable prejudice to the defense."); see also *People v Chism*, 390 Mich 104, 115; 211 NW2d 193 (1973) ("[O]n the matter of prejudice to defendant because of the length of time before his trial, the most important thing is that there is no evidence that a fair trial was jeopardized by delay, although obviously 27 months of incarceration is not an insignificant personal hardship."). Defendant does not argue otherwise. Instead, his claim of prejudice rests on two personal hardships from his "excessive" pretrial incarceration. First, he points to the stress and uncertainty of incarceration, exacerbated by the pandemic. While such anxiety is real, "pretrial incarceration necessarily results in a degree of prejudice to the person. And while anxiety caused by a lengthy delay can occur, anxiety alone cannot establish a speedy-trial violation." *Smith*, ___ Mich App at ___; slip op at 6 (cleaned up). Second, defendant asserts that his pretrial incarceration was "highly prejudicial" because he did not receive sentence credit for that time. But as defendant concedes, he was on parole for another offense at the time of his arrest. As explained below, his failure to accrue jail credit in this case was a consequence of that parole status, not of the delay, and does not constitute cognizable prejudice for speedy-trial purposes.

In sum, although defendant experienced a substantial delay in being brought to trial, the delay was attributable almost entirely to the unprecedented and unanticipated impact of the COVID-19 pandemic, which is not held against the prosecution. On this record, the presumption of prejudice has been overcome. Defendant has not shown that the delay impaired his defense or otherwise violated his constitutional right to a speedy trial. The trial court therefore did not err in denying his motion to dismiss.

## B. INVOLUNTARY STATEMENTS

Defendant next submits that the trial court erred by admitting portions of his custodial interrogation. We review the trial court's factual findings for clear error and its ultimate ruling on a motion to suppress de novo. *People v Stewart*, 512 Mich 472, 480; 999 NW2d 717 (2023). "A finding is clearly erroneous if, after a review of the entire record, the reviewing court is left with a definite and firm conviction that the trial court made a mistake." *Id*. To the extent a constitutional violation occurred, "we review preserved issues of constitutional error to determine whether they are harmless beyond a reasonable doubt." *People v Henry (After Remand)*, 305 Mich App 127, 144; 854 NW2d 114 (2014) (cleaned up).

"Both the state and federal constitutions guarantee that no person shall be compelled to be a witness against himself or herself." *People v Cortez*, 299 Mich App 679, 691; 832 NW2d 1 (2013), citing US Const, Am V; Const 1963, art 1, § 17. A custodial statement is admissible only if the defendant voluntarily, knowingly, and intelligently waived those rights. *People v Barritt*, 325 Mich App 556, 561-562; 926 NW2d 811 (2018). "The use of an involuntary statement elicited by coercive state action in a criminal trial violates these constitutional protections." *Stewart*, 512 Mich at 480. "In other words, if an individual's will was overborne or if his confession was not

-4-

the product of a rational intellect and free will, his confession is inadmissible because it was coerced." *Id*. (cleaned up).

To determine voluntariness, we ask "whether the totality of the circumstances surrounding the making of the confession indicates that it was freely and voluntarily made." *Id*. at 481 (citation omitted). Although "all relevant circumstances" must be considered, particular attention is given to:

> the age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured, intoxicated or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep, or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse. [*Id*. (citation omitted).]

Defendant moved to suppress his statements as involuntary, citing his limited education, alleged intoxication, a head injury sustained during his arrest, and threats to arrest his sister, girlfriend, and his girlfriend's grandmother[2] if he did not cooperate. The trial court rejected most of those claims but found that the threats concerning the girlfriend and her grandmother, made approximately 17 minutes into the interrogation, were impermissible. It accordingly suppressed defendant's statements from that point onward. On appeal, defendant argues that all of his statements should have been excluded.

The trial court correctly concluded that defendant's educational background, physical condition, and mental state did not render his statements involuntary. Defendant testified that he had been in special education and dropped out in 10th grade, and he claimed not to understand the *Miranda*[3] warnings. But the record demonstrated otherwise: defendant admitted he was familiar with the *Miranda* warnings from prior encounters, the detective asked whether he understood his rights and received an affirmative response, and defendant expressly agreed to waive them. The video corroborates the trial court's finding that defendant understood what he was doing.

Nor did intoxication undermine voluntariness. Although defendant testified that he had used cocaine six hours earlier, during the interrogation he denied drug use and even invited the detective to test him. The detective testified that defendant did not appear intoxicated, and the video shows him communicating lucidly and coherently. The trial court did not clearly err in finding that intoxication did not render his statements involuntary.

---

[2] The parties and the trial court repeatedly referenced threats to defendant's "grandmother," but defendant testified at the evidentiary hearing that the threats concerned his girlfriend's grandmother.

[3] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

The same is true of defendant's claimed head injury. While he testified that he struck his head when officers performed a precision immobilization technique maneuver and that he requested medical attention afterward, there is no evidence that he displayed any injury or confusion. The arresting officer testified that he observed no injuries, and defendant himself admitted that he did not complain of pain or request medical care during the interrogation. Notably, he still had not sought treatment for any head injury by the time of the evidentiary hearing nearly a year and a half later.

Accordingly, the record supports the trial court's rejection of these claims. Defendant's education, intoxication, and physical condition did not overbear his will or render his statements the product of coercion.

The more serious concern involves the detective's threats. As the Sixth Circuit has explained, "threats to arrest members of a suspect's family may cause a confession to be involuntary." *United States v Finch*, 998 F2d 349, 356 (CA 6, 1993). This Court has relied on *Finch* to the same effect.[4] When such threats are grounded in probable cause, however, they are not considered coercive. See *id*.; see also *United States v Ray*, 803 F3d 244, 267 (CA 6, 2015) ("Whether a threat to prosecute a third party is coercive turns on whether the threat could have been lawfully executed."); *United States v Johnson*, 351 F3d 254, 263 (CA 6, 2003) ("[W]hether the threat . . . was coercive turns on the issue of whether the threat could have been lawfully executed," which turns on "whether the investigating officers had probable cause to suspect . . . criminal involvement.").

Here, the detective threatened charges against defendant's sister, girlfriend, and girlfriend's grandmother. The trial court correctly ruled that threats regarding the sister did not warrant suppression because she was a suspected conspirator and had already been arrested. But the trial court found that threats to arrest the girlfriend and her grandmother lacked probable cause and were coercive, and it suppressed defendant's statements from approximately the 17:15 mark onward.[5]

The record demonstrates, however, that the first threat concerning the grandmother occurred earlier, at 7:14, when the detective stated:

---

[4] See, e.g., *People v Jones*, unpublished per curiam opinion of the Court of Appeals, issued October 11, 2012 (Docket No. 308482); *People v Hare*, unpublished per curiam opinion of the Court of Appeals, issued September 25, 2012 (Docket No. 305104); *People v Morris*, unpublished per curiam opinion of the Court of Appeals, issued April 25, 2006 (Docket No. 258287). Unpublished decisions by this Court and decisions by lower federal courts are not binding on this Court but may be considered for their persuasive value. See *Micheli v Mich Auto Ins Placement Facility*, 340 Mich App 360, 370; 986 NW2d 451 (2022); *Abela v Gen Motors Corp*, 469 Mich 603, 607; 677 NW2d 325 (2004).

[5] Throughout this case, specific times in the video footage have been made by reference to either the local time when the recording was made (indicated in the corner of the footage), or the timestamp of the video. For consistency, we cite to the timestamp of the video.

*Detective*. What's the old lady's name?

*Defendant*. I don't know.

*Detective*. You probably forgot. Zola, right? Ms. Butterfield? She's now a party to this, too. She's now a party to this, too. Cuz' she is harboring a fugitive, which is you. So potentially, I'm going to seek charges on her, too.

*Defendant*. For what?

*Detective*. Harboring a fugitive.

*Defendant*. Oh no, man.

After this exchange, the detective told defendant that he had "created this huge snowball" and urged him to cooperate. There is no meaningful difference between that threat and the later ones the trial court suppressed. Under its own logic, all statements from the 7:14 mark forward should have been excluded. The failure to suppress them was error. See *Stewart*, 512 Mich at 480.

Even so, reversal is not warranted because the error was harmless beyond a reasonable doubt. See *Henry*, 305 Mich App at 148. Critically, the challenged statements all postdate the 7:14 threat; by that point, defendant had already made the following inculpatory admissions. At the 2:55 mark, when pressed about his sister's role, defendant admitted:

*Detective*. [Your sister] kind of scoped it out, right? Was that under your direction? You told her to do that?

*Defendant*. Mm-hmm.

*Detective*. Mm-hmm, yes?

*Defendant*. Mm-hmm [affirmative].

*Detective*. So just tell me what happened, man.

*Defendant*. I forced her to.

\* \* \*

*Detective*. Well, she was there though, right? You obviously communicated with her. You sent her in there. Who else were you with?

*Defendant*. Just me.

*Detective*. What's that?

*Defendant*. Just me.

Shortly thereafter, defendant claimed not to know "the other two guys" involved in the robbery, but when pressed by the detective, clarified, "I don't know them like that." Those statements, obtained before any coercion, directly tied him to the crime.

That evidence was corroborated by LL's in-court identification, in which she testified that she was "[o]ne hundred percent" certain that defendant was the masked man who held a gun to her head, based on his eyes, body structure, and voice—features she was familiar with from prior encounters, including the day before the robbery.

In light of both defendant's own admissions and the unequivocal eyewitness testimony, it is clear beyond a reasonable doubt that the jury would have convicted him even without the erroneously admitted statements. See, e.g., *id*. at 148 ("[W]hile the trial court erred by admitting defendant's statements, we conclude that, given the untainted evidence in this particular case, admission of the statements was harmless beyond a reasonable doubt."); *People v McKee*, unpublished per curiam opinion of the Court of Appeals, issued February 27, 2018 (Docket Nos. 333720, 335767, and 336598), p 16 (holding that the trial court's error in admitting involuntary statements was harmless when other untainted evidence was "more than enough to allow a rational jury to find beyond a reasonable doubt that [the defendant] killed the victim"); *People v Gamez*, unpublished per curiam opinion of the Court of Appeals, issued February 2, 2016 (Docket No. 324199), p 14 (holding that the trial court's error in admitting involuntary statements was "harmless beyond a reasonable doubt where the court properly admitted the other statements that defendant made and where there was a substantial amount of other evidence of defendant's guilt"). Unlike cases where an involuntary confession supplied the only direct link to the crime, here the improperly admitted statements were largely cumulative of what defendant had already conceded and what LL established independently.

Accordingly, while the trial court erred by failing to suppress defendant's statements from the 7:14 mark onward, the error was harmless beyond a reasonable doubt, and defendant is not entitled to relief.

## C. JAIL CREDIT

Defendant finally contends that he is entitled to resentencing with credit for time he spent in jail before sentencing. "Whether a defendant is entitled to credit for time served in jail before sentencing is a question of law that we review de novo." *People v Armisted*, 295 Mich App 32, 49; 811 NW2d 47 (2011).

The governing statute provides:

Whenever any person is hereafter convicted of any crime within this state and has served any time in jail prior to sentencing because of being denied or unable to furnish bond for the offense of which he is convicted, the trial court in imposing sentence shall specifically grant credit against the sentence for such time served in jail prior to sentencing. [MCL 769.11b.]

As our Supreme Court has explained, the statute "does not entitle a defendant to credit for time served before sentencing if he is incarcerated for an offense other than that for which he is

ultimately convicted, or for other unrelated reasons." *People v Idziak*, 484 Mich 549, 561; 773 NW2d 616 (2009) (cleaned up); see also *People v Prieskorn*, 424 Mich 327, 344; 381 NW2d 646 (1985) ("To be entitled to sentence credit for presentence time served, a defendant must have been incarcerated 'for the offense of which he is convicted.' "). Nor does it "apply to a parolee who is convicted and sentenced to a new term of imprisonment for a felony committed while on parole because, once arrested in connection with the new felony, the parolee continues to serve out any unexpired portion of his earlier sentence unless and until discharged by the Parole Board." *Idziak*, 484 Mich at 562.

Defendant was on parole at the time of the instant offense. He was arrested on February 18, 2019—two days after the robbery—on a warrant for violating parole and then required to serve the unexpired portion of his maximum imprisonment term for the unrelated charges. On June 6, 2019, he was sentenced to serve 18 to 180 months for the parole violation, and he concedes that he was never granted parole before he was sentenced in the present case. Defendant's presentence incarceration was therefore "not because of being denied or unable to furnish bond for the new offense, but for an independent reason," and he is not entitled to jail credit for the time he spent incarcerated before sentencing. *Id*. at 562-563 (cleaned up).

Although defendant acknowledges that *Idziak* and *Prieskorn* foreclose his claim, he argues that those cases were wrongly decided and urges this Court to overrule them. That we cannot do. This Court is "bound to follow decisions of the Supreme Court unless those decisions have clearly been overruled or superseded." *People v Robar*, 321 Mich App 106, 117; 910 NW2d 328 (2017). Because *Idziak* and *Prieskorn* remain binding precedent, defendant is not entitled to credit for his presentence incarceration.

Affirmed.

/s/ Kirsten Frank Kelly
/s/ Matthew S. Ackerman